Case No. 20-mj-179
Assigned to: Magistrate Judge Robin M. Meriweather
Assign Date: 09/08/2020
Description: COMPLAINT W/ARREST WARRANT

## STATEMENT OF FACTS

On August 12, 2020, a member of the Federal Bureau of Investigation ("FBI")/Metropolitan Police Department ("MPDC") Child Exploitation and Human Trafficking Task Force ("CEHTTF") was operating in an undercover capacity (the "UC") out of a satellite office in Washington, D.C. In this capacity, the UC was a purportedly 20-year-old female utilizing an online social media platform known to law enforcement to be a site where individuals involved in the commercial sexual exploitation of women attempt to recruit women and girls to work as prostitutes for their financial benefit.[1]

In this capacity, the UC observed a user with the screen name [redacted]" and sent a wink emoji message to this user, who was later identified as JUSTIN TYSON, date of birth December 12, 1973 (herein the "DEFENDANT"). This user's account had a publically visible biography that read, "Helping connect people who have wants with those who have needs. It really is so simple but we as people make it complicated smh. If this is a Lifestyle your interested in hit me up the money is great and no pimping ma...I'm more like a Mack. Know the difference!" Below is a portion of the initial conversation which ensued between the UC and the DEFENDANT, using the Internet and the social media application described above:

DEFENDANT: Hey
UC: What's good?
DEFENDANT: U trying to get money
UC: Who isn't? What u got going

[1] The name of this social media application is known to law enforcement. It is being withheld to protect the integrity of ongoing investigations.

DEFENDANT: Got a pretty good escort service going pass me your number so we can speak. Can you travel?

UC: Yes I can travel

DEFENDANT: U should come let me host u at a few spots and get this money

UC: Baltimore?

DEFENDANT: Yes. Amongst other places

UC: Oh cool. And I can get good money?

DEFENDANT: Yes. What is ur number

On August 27, 2020, the UC responded to the DEFENDANT and provided a phone number. The DEFENDANT then sent the UC a text message, using phone number [redacted]. The DEFENDANT mentioned that he had a partner, who he referred to as Starr, and he provided the UC Starr's phone number: [redacted]

Using a tool available to law enforcement, the UC was able to determine that phone numbers [redacted] and [redacted] were both used to post numerous sexual solicitation advertisements on the websites Megapersonals, OneBackpage, SkiptheGames, and AdultLook[2] in the Washington, D.C. and Baltimore, Maryland regions. Below is an example of one the posted advertisements found on Megapersonals, listing phone number [redacted], the DEFENDANT's phone number:

Posted August 22, 2020 in Washington, D.C. – Header: "I'm ready…are you WAP[3] ALERT." Body: "But remember sweetie what happened here stays here💋. I never kiss and tell but i do show and prove. Put your money where your mouth is and lets have fun

---

2 These websites are known to law enforcement because they are commonly used to post commercial sex advertisements.

3 In this context, WAP means Wet Ass Pussy

like adults do. I AM A LOW VOLUME PROVIDER MY WALLS INTACT I GOT THAT WAP😛 SAFE PLAY ALERT DONT BE A □ASS DUDE NOTHING WORSE THEN THAT."

On August 27, 2020, at approximately 5:48 p.m., a Confidential Human Source ("CHS") placed a phone call to the DEFENDANT. This phone call was recorded by law enforcement. During the conversation, the CHS asked the DEFENDANT for information about what she would be doing. In response, the DEFENDANT asked the CHS if she liked sex and informed her that she would have to "love sex." The DEFENDANT further stated that he puts people with the CHS who are looking for a "similar experience, meaning they have needs and wants they want taken care and you have some needs and wants from them. You want to be financially compensated for your time." The DEFENDANT also said, "We are not selling sex. We are not offering sexual favors. We are not doing none of that. These people are simply paying you for your time. What happens between consenting adults is what happens. You are not going to be made to do anything you don't want to do."

The DEFEDANT asked the CHS to send him some pictures, including "nudes." The DEFENDANT explained that he would send the pictures around in his "network," via email. The DEFENDANT asked the CHS when she would be available, and the CHS responded that she first wanted to get the information, think about it, and then get back to him. The DEFENDANT stated that whenever she was ready, he had a location where she was "going to kill at. It's going to be crazy. It's going to be so crazy, it's going to be stupid." The DEFENDANT explained that they would travel around to hotels in different states, including Maryland, Washington, D.C., Pennsylvania, and Virginia.

The CHS stated that she understood that whatever happens with the clients would be up to her, but she wanted to know that " if she was down for sex or blowjob, do the guys wear condoms?" The DEFENDANT responded that safety is important and that "we about having a family and getting this money. We like to see people prosper." The DEFENDANT later stated that "mother fuckers, like pimps, take all the money." The CHS then asked if there was a percentage of the money that she earned engaging in commercial sex work that she would be able to keep. The DEFEDNANT stated that they split everything 50/50 and said, "we in this together." The CHS asked the DEFENDANT about various pricing, inquiring if it was "an hourly thing" and if she would be paid more if she was willing to have sex or anal. The DEFENDANT stated, "exactly we charge more for all of that." The DEFENDANT continued to explain that, "when we give a price, that is just basic price to get them in the door." The DEFENDANT explained that a "short stay"[4] would cost a customer $100, while an hour would cost $200, but he stated that "just to get them in the door and anything extra would be more money."

The DEFENDANT stated the CHS would stay in various hotels. He also informed her that, even though he has other girls working for him, the CHS probably would not see them that much. The DEFENDANT said that the CHS would mostly be dealing with him and his partner. The DEFENDANT advised that he would handle the phone calls with the clients for the CHS, and that she would not have to deal with arranging the commercial sex dates. The DEFENDANT stated there were clients that would pay $1000 to $1500 for overnight visits.

---

[4] A short stay is known to law enforcement as a term used in commercial sex to describe 15-20 minutes of time.

The CHS asked about what would happen if she were to get caught while engaging in commercial sex. The DEFENDANT admitted that there is a chance of getting caught by police, but he said that he would train her about what to do so that she would not get caught. The DEFENDANT explained, for example, that if she answered the door naked, the police would not be able to apprehend her. The DEFENDANT informed the CHS that he had been doing this for 20 years, and that no one that he has worked with ever got caught by the police. The DEFENDANT stated that many girls come to them (referring to himself and his partner, Starr) because they have been caught in the past, but that the DEFENDANT and his partner could provide them with security.

On September 2, 2020, the DEFENDANT agreed to drive from Baltimore, Maryland to Washington, D.C., to meet the UC, in order for the UC to begin working as a prostitute for him. The UC and the DEFENDANT exchanged the following text messages on that date:

> UC: I just gotta do this one last thing with her on Wednesday morning b4 I can up and leave
>
> UC: U feel me
>
> DEFENDANT: Yes ma it's all good
>
> DEFENDANT: I can't pick u up til afternoon but it's all love
>
> UC: Ya that cool
>
> DEFENDANT: Yayyyyyyy
>
> UC: U work everyday?
>
> DEFENDANT: Mon thru Friday 9 to 5 weekends are ours
> UC: Gotcha. Ur work fun?
>
> DEFENDANT: While I'm working which is typical slow escort hours u can be sleeping watching tv getting high ehatever I will still be sending clients to u ur money never stops

DEFENDANT: U will have contact of my partner also to help

DEFENDANT: So 24/7 care and security support

UC: Does she work too

UC: ?

DEFENDANT: No

DEFENDANT: This is Ms. Starr

DEFENDANT: Can u talk

UC: To her?

UC: Would she be coming when u come get me?

DEFENDANT: Yes we are riding together

DEFENDANT: Is it ok?

UC: Ya that's fine

DEFENDANT: Cool

UC: After u pick me up, where will be going ?

DEFENDANT: Laurel Rosedale or pikesville

UC: Is that where I'll be working?

DEFENDANT: Yes

DEFENDANT: We may go up York pa

On September 2, 2020, the UC sent a test message to the DEFENDANT, asking, "U still comin today?" The DEFENDANT replied, "Yep if it's good with u?" Below is a portion of the subsequent text messages exchanged between the UC and the DEFENDANT:

DEFENDANT: How u feeling?

DEFENDANT: Plan is getting off work shoot down to u hit a few plays coming back to get some dollars in ur pocket and figure out where to settle in I'm getting hits for u everywhere

UC: I'm feel good. Anything special I should bring?

DEFENDANT: Just ur clothes for a couple days not sure how long u intend to stay but u r welcome to bring what u like

DEFENDANT: Ask away any questions u may have

DEFENDANT: I'm going to send u possible location address sometimes during the day

UC: Ok. I'm gettin excited

DEFENDANT: Lol

DEFENDANT: Me too

UC: Can't talk on phone right now. What's up?[5]

DEFENDANT: Needed to rap a bit will catch u later I can't talk now or please call my partner I'm giving her itinerary now ████████ Starr

DEFENDANT: She knows everything and can speak for me

UC: Ok. I will call her

On September 2, 2020, at approximately 4:26 pm, the CHS called phone number ████ ██████, in order to speak to Starr. When the conversation began, Starr initially acted like she did not know the DEFENDANT or that the DEFENDANT told the CHS to call her to speak about the itinerary. As the conversation continued, Starr informed the CHS that she and the DEFENDANT make money together. The CHS explained that the DEFENDANT told her she would be meeting clients and traveling. Starr told the CHS that they travel to Baltimore, Washington, D.C., and Pennsylvania. The CHS asked Starr what would happen after they picked her up in DC. Starr replied, "We would probably get a room or a hotel and we would set up

---

[5] The DEFENDANT had called the UC.

everything with the clients." Starr stated that the money made by the CHS, for commercial sex, would be split 50/50 between them (meaning Starr and the DEFENDANT) and the CHS. The CHS stated that the DEFENDANT told her that the clients would be wearing condoms, and Starr replied, "If condoms are not used, that's extra." Star informed the CHS that she is the DEFENDANT's partner and that she does go on the dates sometimes but her role is to "makes sure money comes through the door. That's my job."

Starr advised the CHS that she would walk with the CHS and that she would be in the room when she first engaged in commercial sex acts. Starr stated that she and the DEFENDANT have been working together for about 10 years. The CHS asked Starr if the DEFENDANT was the "boss boss." Starr replied that "they share." The CHS mentioned that the DEFENDANT told her about getting clients online, but the CHS wanted to know how that would work, and if she would be posted on a website. Starr replied that it could be done that way (referring to the website) but that they have several clients who they "work" with regularly.  The CHS informed Starr that she was ok with sex and blowjobs. The CHS also told Starr that the DEFENDANT told her that "anal" is more, to which Starr replied, "anal is definitely more." Starr also explained that an "all niter" would cost between $1000 and $1500. Starr ended the conversation, and told the CHS that she would come with the DEFENDANT to pick up the CHS.

The UC agreed to meet the DEFENDANT at 1615 New York Avenue, Northeast, Washington, D.C. sometime after 5:00 p.m. on September 2, 2020. The UC and the DEFENDANT exchanged text messages about when the DEFENDANT would arrive. During this exchange, the DEFENDANT stated that he was waiting for Starr to come and pick him up, so that they could drive from Maryland to D.C. to pick up the UC. At approximately 8:00 p.m., the DEFENDANT called the CHS. The DEFENDANT stated that there was a bad rain storm, so

he suggested that the CHS take a bus from Washington, D.C. to Baltimore. The DEFENDANT offered to buy the CHS a bus ticket from Washington, D.C. to Baltimore, Maryland, and he stated that there was a bus leaving Washington, D.C. at midnight. The CHS informed the DEFENDANT that she did not feel safe traveling that late at night. In response, the DEFENDANT offered to buy a ticket for a bus that was leaving at 9:55 p.m., but the CHS informed the DEFENDANT that she wanted to travel during the daytime.

On September 3, 2020, the DEFENDANT sent the UC a text message, and the following exchange ensued:

DEFENDANT: Gm baby

DEFENDANT: Let me know when you ready so I can order ticket and send ur cashapp

UC: My auntie wants me at some cookout on Monday

UC: I know it a few days away but can u get the ticket for Tuesday

DEFENDANT: That's no problem family comes first

DEFENDANT: No problem

UC: Ok cool

UC: Will u get the ticket today?

DEFENDANT: Yes

UC: Anytime that day is good

DEFENDANT: I need ur info though

UC: What all u need?

DEFENDANT: First and last name

UC: <name redacted>

DEFENDANT: Ok doing it now

DEFENDANT: U sure u don't want to come for the weekend

UC: When I leave, I don't want to come back

UC: Don't need my aunt asking bunch of questions

DEFENDANT: Come

DEFENDANT: Show up to her Monday

DEFENDANT: Leave again

DEFENDANT: Baby the world is urs let's take it together

UC: I really don't want to come back and have to deal with her

UC: Once I'm gone I'm gone

DEFENDANT: Come

DEFENDANT: No need to bs around

DEFENDANT: If ur not happy we need to get u where u can be happy

UC: I'm not bsing

UC: U could have had last night

DEFENDANT: I know ur not

UC: I just ain't looking for unnecessary drama with my aunt

DEFENDANT: I'm not saying u r I'm just saying come let's get this started

DEFENDANT: It's the first of the month

DEFENDANT: It's the weekend

DEFENDANT: And dicks will be hard from here to Toledo

DEFENDANT: Let's get the money

UC: I think they will still be hard ton Tuesday lol

DEFENDANT: No drama I been in ur shoes

UC: U don't know my aunt

DEFENDANT: Lol yes they will be

DEFENDANT: Ur right

DEFENDANT: I don't

DEFENDANT: But I know it's best to strike while the weekend warriors got bread

UC: It's just easier this way and that way so can be all in when I come

DEFENDANT: Ok

DEFENDANT: No stress

DEFENDANT: I'm here getting ticket now

DEFENDANT: Just making sure u sure

UC: I'm sure. I know its a wait but it will make me feel better

DEFENDANT: Did u get information

DEFENDANT: Ur trip is confirmed

On September 3, 2020, at approximately 10:24 am, the DEFENDANT purchased a Greyhound bus ticket from Union Station (Washington, D.C.) to Baltimore Downtown Bus Station scheduled to depart on September 8, 2020 at 4:50 p.m., and arriving in Baltimore, Maryland at 6:15 p.m. The bus ticket was purchased by a Visa credit card in the DEFENDANT's name. The CHS's name is listed as the name of the traveling passenger.

## Conclusion

Based on the above information, there is probable cause to believe that the DEFENDANT, JUSTIN TYSON, a/k/a [redacted]," committed the following offenses: Coercion and Enticement, in violation of Title 18 U.S.C. § 2422(a) and Interstate and Foreign Travel or

Transportation in Aid of Racketeering Enterprises, in violation of Title 18 U.S.C. § 1952(a)(3)(A) on or about and between August 12, 2020 and September 8, 2020.

Respectfully submitted,

Jeremiah Johnson
Detective
MPD

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone this 8th day of September, 2020.

2020.09.08
18:19:44 -04'00'

ROBIN M. MERIWEATHER,
UNITED STATES MAGISTRATE JUDGE