**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** : | | |
| : | | |
| v. : | | |
| : | Case Number: 20-mj-179 | |
| **JUSTIN TYSON,** : | | |
| : | | |
| : | Detention Hearing:   September 11, 2020 | |
| **Defendant.** : | | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF**
**PRETRIAL DETENTION OF DEFENDANT JUSTIN TYSON**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, submits this memorandum in support of its request that defendant Justin Tyson be detained pending the trial of this matter pursuant to 18 U.S.C. § 3142(f)(1)(A). The defendant has been charged by Criminal Complaint in the District of Columbia with Coercion and Enticement, in violation of 18 U.S.C. §2422(a) and Interstate and Foreign Travel or Transportation in Aid of Racketeering, in violation of 18 U.S.C. § 1952(a)(3)(A).  An analysis of the factors set forth in 18 U.S.C. § 3142(g), as explained below, leads to the conclusion that detention is appropriate because there is no condition or combination of conditions that will reasonably assure the appearance of such person as required and the safety of any person and the community.

**FACTUAL BACKGROUND**

On September 9, 2020, Justin Tyson, A/K/A $teel ENT Escort (hereinafter the Defendant), was arrested when he showed up at a bus station in Baltimore, Maryland, expecting to pick up a twenty-year-old woman, whom he intended to commercially and sexually exploit for his own financial benefit.  In support of the Government's Motion for Pretrial Detention, the Government

relies on the sworn Statement of Facts in support of the Complaint and Arrest Warrant, filed with the Court on September 9, 2020, with a few points of clarification and some additional facts gained during the course of this ongoing investigation.

This investigation began nearly a month ago, August 12, 2020, when a member of the Federal Bureau of Investigation ("FBI")/Metropolitan Police Department ("MPDC") Child Exploitation and Human Trafficking Task Force ("CEHTTF") was operating in an undercover capacity (the "UC") out of a satellite office in Washington, D.C. In this capacity, the UC was a purportedly 20-year-old female utilizing an online social media platform. To be clear, this is a social media platform that has been around for over fifteen years, claims to have over 300 million members, and is marketed as an easy way to meet and socialize with new people through games and shared interests.[1] This platform was specifically chosen because it is known to law enforcement to be a site that individuals, like the Defendant, who engage in the commercial sexual exploitation of women, post profiles advertising and glamorizing their criminal lifestyles, and seek out women to work for them in the dangerous world of prostitution.

It was through the course of this investigation that the UC observed a user with the screen name "$teel ENT Escort." A short review of the Defendant's publically available profile on this website makes it absolutely clear that he is bragging about his illegal lifestyle, and that he is looking to recruit individuals to work for him. A copy of the Defendant's publically available profile will be filed separately as Exhibit A.

First, the Defendant's chosen username, "$teel ENT Escort," leaves little doubt as to his reason for utilizing this social media website. If this is not enough, his short "biography" further

---

[1] This explanation is taken from the website associated with this social media platform. As stated in the Criminal Complaint, the name of this website is being withheld to protect the integrity of other investigations.

emphasizes that he is using this website as a way to illegally advertise commercial sex: "Helping connect people who have wants with those who have needs. It really is so simple but we as people make it complicated smh. If this is a Lifestyle your interested in hit me up the money is great and no pimping ma...I'm more like a Mack. Know the difference!" *See* Exhibit A.  The photographs that this Defendant chooses to place on this publically available social media website highlight drug availability, scantily clad women, hotel rooms, and even a text exchange showing the Defendant setting up a commercial sex "date".  Id. Even more disturbingly, there is a photograph of the Defendant, holding a shotgun, carrying numerous shells, and wearing what appears to be a handgun on his hip.[2]  In sharp contrast, the profile utilized by the UC was a profile created by a seemingly "normal" user.  There is absolutely no reference to prostitution, nor commercial sex, and there is certainly no reference to drugs, hotel rooms, or firearms. Instead, the photographs that were specifically chosen by law enforcement for this UC profile show a young woman engaging in everyday activities.  There are zero photographs depicting the young woman scantily clad or in sexually provocative poses.

During the course of the chats between the UC and the Defendant, the Defendant provided the UC with telephone number (410) 413-3733.  He also informed the UC that he had a partner, who he referred to as "Starr."  According to the Defendant, Starr's phone number is (410) 900-2766.  Through the investigation, law enforcement believes that Starr is depicted with the Defendant in photographs posted on the publically available social media profile.  *See* Exhibit A at pages 9-10.  Using a tool available to law enforcement, the investigation has revealed that both of these phone numbers have been used to post numerous sexual solicitation

---

[2] The Defendant is a convicted felon.  As such, it is unlawful for him to possess firearms and ammunition.  *See* 18 U.S.C. §922(g)(1).

3

advertisements on the websites Megapersonals, OneBackpage, SkiptheGames, and AdultLook[3] in the Washington, D.C. and Baltimore, Maryland regions. Advertisements were posted on Megapersonals using a phone number and an email address associated with the Defendant as recently as September 6, 2020.  It is also important to note that both of these numbers are "Text Now" phone numbers.  As such, these are not phone number associated with any traditional phone companies, which can be easily tracked by law enforcement and which require users to provide information and billing methods, which can aid in identifying the user(s) of these phone numbers.  Rather, these numbers run through connection with the Internet, and allow users to better hide their identity and switch numbers frequently in an effort to avoid law enforcement detection.

    What's clear from the Defendant's profile, and the ensuing text and exchanges that he engaged in with the UC, is that the Defendant was explicitly attempting to recruit a young woman to engage in commercial sex acts for his own financial benefit.  The investigation has revealed that this is not an isolated incident.  At the time of the Defendant's arrest, he was in possession of two cellular phones.  A warrant authorizing the search of both of these phones was obtained from the District Court of Columbia, on September 10, 2020.  While forensic analysis of these devices is ongoing, an initial preview has revealed that the Defendant has recruited other young women using the same social media website.  He then engages in text exchanges with the young women, where he offers to create "profiles" for them; find "dates" for them; and take a portion of their proceeds.  Below is a portion of a text exchange between the Defendant and a young woman on June 11, 2020:

---

[3] These websites are known to law enforcement because they are commonly used to post commercial sex advertisements.

    Defendant:  Have you ever escorted?
    Individual A:  Yes
    Defendant:  We could get money what are your dos and don'ts
    Individual A:  Not looking for a pimp
    Defendant:  No a pimp ma pimps take ur money we break bread

    As this text exchange continued:

    Individual A:  u going to send me guys
    Defendant:  Yes if u like
    Individual A:  ok
    Individual A:  No anal
    Defendant:  Cool
    Defendant:  Can us see ppl at ur residence
    Defendant:  Or do we need a room
    Individual A:  Send three pics u feel comfortable with ppl seeing I will put u in rotation to get u going
    Individual A:  (Sends three pictures of a young woman clothed and in various states of undress)
    Defendant:  Very nice
    Individual A:  Thanks
    Defendant:  Give me a few minutes Putting profile together
    Defendant:  Ok I put everything together I have a 70 head date for u what address should him
    Individual A:  He paying me right?
    Defendant:  Yes
    Individual A:  wat I give u
    Defendant:  U get paid off top
    Defendant:  We split
    Individual A:  Hell no

    A review of text messages found on a cellular phone belonging to the Defendant show that between June of 2020 and September 8, 2020 – the day before the Defendant's arrest – the Defendant continued to arrange "dates" for Individual A and that he was receiving at least a portion of the money that she was earning engaging in commercial sex.

    Furthermore, the investigation has revealed that Defendant's arrest earlier this week, which brings the Defendant before the Court today, is not the Defendant's only contact with law enforcement for engaging in this type of criminal behavior.  Law enforcement is in possession of a police report from Anne Arundel County, dated December 23, 2018, which is disturbing

because it suggests that the Defendant is violent towards women that are working for him and that some of these women may feel that they are engaging in commercial sex acts against their will. On December 23, 2018, Anne Arundel County Detectives responded to a hotel in Hanover, Maryland, in response to a report of an assault. Upon arrival, law enforcement spoke to a woman who stated that the Defendant assaulted her inside the hotel. According to this witness, she had been trying to enter the Defendant's hotel room in order to speak to another woman who was inside. The witness identified the woman inside the hotel room as "Star", which is significant because in the present case, the Defendant informed the UC that he worked with a woman who he referred to as "Star". *See* Statement of Facts from the Complaint. Instead of allowing the woman to enter the hotel room, the Defendant pushed her and struck her in the back of the shoulder with a closed fist. During her interview with law enforcement, the witness asked, "But what about him taking the other girl's money and making her come up here?" The witness explained that there was another woman in the hotel that she had met a few nights before the assault occurred. The witness told law enforcement that the Defendant had brought the woman to the hotel in Maryland from Virginia, and that the Defendant had taken the woman's money.

Law enforcement were able to speak with the victim, who stated that the Defendant took money from her. When asked if she was at the hotel in Maryland of her own free will, the victim shook her head no. She stated that on December 21, 2018, the Defendant called her repeatedly, asking for her to come up to Maryland. The Defendant informed the victim that it was "urgent" and that he "needed her" to come up. The victim indicated that the Defendant sent a car to pick her up, and brought her to the hotel. The victim stated that the Defendant arranged for seven different men to come to her hotel room to engage in commercial sex. The victim denied making

any prior arrangements for engaging in commercial sex. The victim told law enforcement that the Defendant would take $20 from every $100 that she made engaging in commercial sex. The victim also stated that after hearing arguments between the Defendant and the witness, she felt unsafe, and that she went to stay in "Star's" room for the evening. The victim informed law enforcement that the Defendant bragged that he had seven girls working for him. The victim indicated that she was afraid because the Defendant knew where she lived, and that he now knew that she spoke with law enforcement. Both the Defendant and "Star" were at the hotel when law enforcement arrived.

Law enforcement has located an advertisement posted on Megapersonals on December 21, 2018 which appears to be related to this incident. A redacted copy of this advertisement, which removes the photographs of the women in an effort to protect the identity of potential victims and witnesses, will be filed separately as Exhibit B. Based upon the statements made by the victim and the witness, and the fact that the photographs used in these advertisements have been located on the Defendant's cellular telephone, law enforcement believes that the Defendant took these pictures and created and posted this advertisement offering up two different women for commercial sex. *See* Exhibit B.

The initial forensic preview has revealed numerous pictures of women in various states of undress, and it is believed that several of these images have been used in commercial sex advertisements. Furthermore, there are several pictures in one of the Defendant's cellular telephones that depict a collection of weapons, and which show weapons in the hands of what appears to be females. Samples of these pictures will be filed separately as Exhibit C. As stated above, as a convicted felon, it is illegal for the Defendant to possess these firearms, which only heightens the Government's concern for the danger that this Defendant poses to the community

should he be released. Therefore, as further outlined below, the Defendant should be detained pending trial.

## APPLICABLE LEGAL STANDARD

The Bail Reform Act permits a judicial officer to hold an individual without bond pending trial if the officer finds clear and convincing evidence that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Pursuant to 18 U.S.C. § 3142(f)(1)(A), the judicial officer shall hold a hearing on the question of detention upon the motion of the government in a case that involves a crime of violence. 18 U.S.C. § 3142(f)(1)(A). The Defendant is charged with violating 18 U.S.C. § 2422(a), a Chapter 117 offense. Any felony offense under Chapter 117 is a crime of violence. 18 U.S.C. § 3156(a)(4)(C).

In determining if there are conditions of release that will reasonably assure the appearance of the person as required and the safety of the community, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g).

## ANALYSIS

For the reasons that follow, the government submits that that the Defendant shall remain detained, as there is no condition or combination of conditions that will reasonably assure the appearance of the Defendant as required and the safety of any other person and the community.

### A. Nature and Circumstances of the Charged Offense

This factor clearly favors detention, since, as stated above, the offense is a crime of violence which involves the targeting of vulnerable, young women for the purpose of sexually exploiting them for his own financial gain. Rather than a one time, isolated incident, involving a UC rather than a "real" victim, the early stages of the Government's investigation has revealed that this Defendant has been involved in this lifestyle for at least 2 years, and that he was continuing to engage in this criminal behavior up until the moment of his arrest. The initial forensic preview has suggested that there are other women who have been recruited in the same fashion as the Defendant attempted to recruit the UC, and that this Defendant has bragged about the number of women that he has "working" for him at any one time. What is even more disturbing is that, at least on one prior occasion, there is reason to believe that the Defendant has been violent, and that the women involved are not only being commercially and sexually exploited, but that they are doing so out of fear and against their will.

The criminal offenses that the Defendant is charged with are extremely serious, violent offenses that pose a grave danger to the safety of the community. The world of commercial sexual exploitation is extremely dangerous. Studies have shown that women who are engaged in prostitution experience violence ranging from slapping and punching to assaults with deadly weapons and rape. *See* Dalla, R. (2000, November). *Exposing the "pretty woman" myth: A qualitative examination of the lives of female streetwalking prostitutes*. The Journal of Sex Research, 37(4), 344-353 (In a study of prostituted women, 72.1 % reported severe abuse at the hands of pimps, male sexual buyers, or boyfriends. The acts of abuse include being raped, beaten with objects, threatened with weapons, or abandoned in remote locations). An investigation into the mortality rate of women in prostitution revealed that the leading cause of death was homicide,

and found that actively prostituting women were nearly 18 times more likely to be murdered than women of similar age and race.  *See* Potterat, J., Brewer, D., Muth, S., Rothenberg, R., Woodhouse, D., Muth, J. et al. (2004). *Mortality in a long-term open cohort of prostitute women*. American Journal of Epidemiology, 159(8), 778-785.  Furthermore, studies have also demonstrated that a high percentage of individuals who are involved in commercial sex work want to stop prostituting, but feel that they are trapped.  *See* Farley, M. and Barkan, H. (1998). *Prostitution, violence against women, and posttraumatic stress disorder*. Women & Health, 27(3), 37-49.  This study eerily echoes what the victim told Anne Arundel police when she was interviewed in December of 2018.  As such, this factor weighs heavily in favor of detention.

**B. The Weight of the Evidence Against the Defendant**

As summarized above, the evidence against the Defendant is extremely strong.  The Defendant's profile on the social media website; the chats he exchanged with the UC; and the recorded phone calls with the CHS are all recorded and in the Government's possession.  Additionally, the Defendant used a credit card in his own name in order to buy the bus ticket for the UC to travel from the District of Columbia to Maryland, in order to engage in prostitution for his financial benefit.  This credit card was located inside the Defendant's wallet at the time of his arrest, and it has been seized as evidence.  Furthermore, the Defendant showed up at the agreed upon meeting spot- the Baltimore bus station – which facilitated his arrest.

The Government is still uncovering advertisements posted by the Defendant on various websites offering women up for commercial sex.  Additionally, the Defendant's cellular telephones are proving to provide additional, corroborative evidence that will no doubt lead to the identification of additional victims and witnesses, and demonstrate the ongoing nature and scope of this Defendant's criminal conduct. This developing evidence could very well lead to

additional criminal charges either in the District of Columbia, or in other jurisdictions. Therefore, the weight of the evidence strongly favors detention, as well.

### C. The History and Characteristics of the Defendant

The Defendant's history and characteristics weigh heavily in favor of detention. First, at the present time, the Court has no information about the Defendant's residence, his educational background, nor his employment history. Instead, the Court is faced with strong evidence regarding this Defendant's drug use, his affinity for firearms, and the fact that he seems to earn his living through illegal acts that sexually exploit and endanger women. There is no evidence that he has any ties to the D.C. community- other than his persistent efforts to recruit women located in the District of Columbia, and to advertise them up for commercial sex to individuals who live here.

Furthermore, this Defendant has a conviction for Possession with Intent to Distribute a Controlled Substance, from 2002, where he was sentenced to 72 months imprisonment, with 71 months suspended. He was sentenced to three-years-probation, which, according to the Pre-Trial Services Report, he violated. It appears that rather learning from this contact with the criminal justice system, the Defendant reoffended. He was arrested again, in 2003, and he has a 2006 conviction for the Criminal Distribution and Manufacture of a Controlled Substance, where he was sentenced to ten years imprisonment. According to the Pre-Trial Service Report, he committed a violation of his supervision, following his release, and he was sentenced to serve an additional year in prison. He was arrested in 2007 for Assault, but the case was not prosecuted. The Defendant was arrested again for Assault, in 2010, but the case was eventually put on the STET document and ultimately dismissed. Even if the Court feels that the Defendant's felony convictions are remote in time, his history of failing to comply with the terms and conditions

imposed by both Courts upon his release should give this Court great pause when considering his release for the instant offenses.

Furthermore, as stated above, the initial stages of this investigation has shown that the Defendant does not stand before the Court based upon a one time lapse in judgment or mistake. Rather, he has engaged in an ongoing course of criminal conduct that exploits women. Not only that, but he has bragged about it on social media. Nothing could be a better indicator of this Defendant's true history and character. As such, the Defendant should be detained pending trial.

### D. The Nature and Seriousness of the Danger to Any Person or the Community

The evidence here establishes that the defendant represents a grave danger to the women that he has sexually exploited, who may become victims and witnesses in this case, as well as to the community at large.

As a result of the criminal actions of the Defendant, and others like him who engage in the commercial sexual exploitation of women, residents living in the areas in which prostitution is happening often find themselves as target witnesses to, and victims of, crime. In the case of prostitution occurring in hotels, it leads to complaints by other guests and harms the business of the hotel itself. This is due to the nature of the activity that is happening, the clientele that is entering and exiting the premises illegally, and the involvement of law enforcement. As stated above, this very situation presented itself on at least one prior occasion, where a woman reported that the Defendant assaulted her inside a hotel in Maryland, and when law enforcement responded to that hotel, they found that another woman was being allegedly held against her will.

This is especially troubling in light of the Defendant's criminal history and his apparent access to weapons, based upon pictures he has posted online and pictures that have been found in his phone. Despite the fact that he is prohibited from owning a firearm, this Defendant shows off

his access to them. As this Court is well-aware, a firearm has the potential of causing meaningful bodily injury to innocent members of the community, to include death. Moreover, homicides in the District are up 15% this year, from 2019. Thus, the risk to others is plainly serious. For these reasons, the government submits that the Court should order the defendant's detention during the pendency of this case to protect not only the potential victims and witnesses in this case, but the community at large, as well.

## THE IMPACT OF COVID-19 ON THE COURT'S ANALYSIS

This Country has now been facing the impact of COVID-19 for nearly six months. The mere possibility that the Defendant might, while incarcerated, contract a disease that is also present in the community at large does not alter the finding of the danger that the defendant presents to the community if he were released.

In preparing to respond to these and other similar motions, the United States Attorney's Office has consulted with DOC to obtain relevant information as to its handling of the public health crisis, and passes this information along to the Court for its consideration. Indeed, this office continues consulting with the DOC in light of the rapidly-changing situation. Based upon the information provided to the government at present, it appears that DOC has put in place strategies, procedures and methods that have brought this pandemic under control in the DC jail.

On September 8, 2020, the DOC provided the Chief Judge with the following information:

Presently, there are 959 residents at the District of Columbia Department of Corrections' (DOC) Central Detention Facility, 462 residents at DOC's Correctional Treatment Facility, 3 residents at local hospitals, and 1 resident at a halfway house. No residents tested positive for COVID-19 today, September 8, 2020. Currently, there is one positive COVID-19 case at DOC's correctional facilities.

Therefore, the presence of this virus, which is widespread and not well controlled in the community, is under control in the DC jail. As such, it should in no way alter the Court's

consideration of the statutory factors as detailed above. As such, the Defendant should be detained pending trial.

## **CONCLUSION**

For all of the reasons set forth above, a consideration of the evidence in this case and the applicable statutory factors compels the conclusion that the Defendant should be detained pending trial.

        Respectfully submitted,

        MICHAEL SHERWIN
        UNITED STATES ATTORNEY
        N.Y. Bar No. 4444188

By: s/ Amy E. Larson
     AMY E. LARSON
     Assistant United States Attorney
     N.Y. Bar No. 4108221
     U.S. Attorney's Office
     555 4th Street, N.W.
     Washington, D.C. 20530
     202-252-7863
     Amy.Larson2@usdoj.gov